IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES E. BENJAMIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-cv-00962-BL-KFP |
| | ) | |
| DERRICK BONE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff James Benjamin filed this action against Defendants Derrick Bone, Deputy Sheriff/Investigator of Chilton County, Alabama, and John Shearon, Sheriff of Chilton County. (Doc. 1). Plaintiff's Second Amended Complaint asserts five counts: Counts I, II, and III contain 42 U.S.C. § 1983 claims against Defendant Bone in his individual capacity for malicious prosecution and Counts IV and V contain 42 U.S.C. § 1983 claims against Defendant Shearon in his individual capacity for supervisory liability of Defendant Bone. (Doc. 29). The Plaintiff seeks monetary relief in the form of compensatory and punitive damages. (Doc. 29).

Defendants Bone and Shearon filed a Motion for Summary Judgment on the Plaintiff's claims for malicious prosecution and supervisory liability. (Doc. 57). The Plaintiff filed a Motion for Partial Summary Judgment on his claims against Defendant Bone for malicious prosecution. (Doc. 60) In his response to the

Defendant's Motion for Summary Judgment, the Plaintiff "concedes that, on this record, Defendant Shearon is entitled to summary judgment on Counts IV and V." (Doc. 65 at 5). Due to the Plaintiff's concession that Defendant Shearon is entitled to summary judgment, the court granted summary judgment and issued a final judgment as to all claims against Defendant Shearon on May 20, 2024. (Doc. 73). The Plaintiff's claims against Defendant Bone for malicious prosecution remain pending.

For the reasons set forth below, the undersigned finds that Defendant Bone's Motion for Summary Judgment and the Plaintiff's Motion for Partial Summary Judgment are due to be denied.

## I. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no dispute

of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-324. To establish a genuine dispute of material fact, the nonmoving party must produce such evidence as would be sufficient for a reasonable trier of fact to return a verdict in its favor. *See Waddell v. Valley Forge Dental Assocs., Inc*., 276 F.3d 1275, 1279 (11th Cir. 2001). Further, when evaluating whether a genuine dispute of material fact exists, the court must view all evidence in a light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmovant's favor. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

Once the moving party has met its burden, Federal Rule of Civil Procedure 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the moving party is entitled to summary judgment. *Id*. at 322.

Cross-motions for summary judgment do not alter the Rule 56 standard. *United States v. Oakley*, 744 F.2d 1553, 1555–56 (11th Cir. 1984). When

considering cross-motions for summary judgment, district courts "should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir.), cert. denied, 144 S. Ct. 103 (2023). When parties file cross-motions for summary judgment, a district court has "three options: granting summary judgment for the plaintiff under the defendant's best case, granting summary judgment for the defendant under the plaintiff's best case, or denying both motions for summary judgment and proceeding to trial." *Id*.

## II. Facts

The dispute in this action concerns three separate warrants sought by Defendant Bone against the Plaintiff for violations of the Alabama Sex Offender Registration and Community Notification Act ("ASORCNA") that allegedly occurred in April and June of 2018. In 1987, the Plaintiff pleaded guilty to sodomy in the second degree and was sentenced to 25 years confinement in the Alabama Department of Corrections ("ADOC"). (Doc. 58-1 at 3, 13). Upon his release from ADOC in 2011, the Plaintiff was required to register under ASORCNA, which requires the Plaintiff to register his address with law enforcement in the county that he resides and forbids establishing residence within 2,000 feet of any school or childcare facility, among other things. (Doc. 61-2 at 10-20). The Plaintiff testified that, after his release from ADOC, he moved to Chilton County, Alabama in 2011.

(Doc. 58-2 at 4). Defendant Bone testified that, in 2014, he began supervising sex offenders in Chilton County and, at the time of his deposition in October 2023, he managed 174 sex offenders. (Doc. 58-3 at 3-4). Defendant Bone testified that, to verify that sex offenders were living at their registered address, he would conduct home-compliance checks, in which he stated that he would "go to the sex offender's house and see if [he could] make contact with them at [their] listed registered address." (Doc. 58-3 at 13).

When asked during his deposition about the process Defendant Bone undertakes to obtain a warrant when he believes he has probable cause, Defendant Bone testified that he presents an incident/offense report to the magistrate. (Doc. 58-3 at 6). Defendant Bone acknowledged that the magistrate then uses the narrative portion of his incident/offense report to prepare the complaint that is issued with the warrant. (Doc. 58-3 at 6). Defendant Bone further testified that when he presents his incident/offense report to the magistrate for preparation of the complaint, Defendant Bone stated that he "put[s] all the evidence in there … [u]nless there's something [that] comes up later -- I can add to the report -- I would put it in the report." (Doc. 58-3 at 7). When asked whether he ever drafts an incident/offense report after he obtains a warrant, Defendant Bone stated "[n]o" but then stated that "[i]f there's an on-site arrest … I would arrest them; then do the [incident/offense] report later." (Doc. 58-3 at 7). In reference to his completion of incident/offense

reports at a later date than when he started the report, Defendant Bone testified that "when you go back in the report to edit it, it asks for a supplement date and it puts a supplement date that you open the report" which is automatically populated as the date the incident/offense report is supplemented. (Doc. 58-3 at 8).

In an incident/offense report dated April 24, 2018, Defendant Bone stated, in relevant part:

> James Benjamin is a register[ed] sex offender for sodomy 2nd and registers his address at 12387 County Road 59, Verbena, AL. I received information that James Benjamin was living on Hinkle Road next to West End Baptist Church. On April 17th, 2018[,] around 10:30PM, I observed James Benjamin standing in the yard at 105 Hinkle Road. I also observed his car parked in the driveway. At approximately 11:42 PM, Deputy Freeman and myself went to his registered address and did not make contact with James Benjamin. On April 18th, 2018, around 11:11 PM, I went to his registered address and did not make contact with him. I then drove by 105 Hinkle Road and observed his car at the residence. On April 19th, 2018, Deputy Smitherman observed his car at 105 Hinkle Road and then Deputy Smitherman went to the registered address and did not make contact with James Benjamin. James Benjamin has failed to spend 3 consecutive nights at his registered address and has failed to notify the Chilton County Sheriff's Office of another address.

(Doc. 61-4 at 1-3). Regarding the April 17, 2018, allegations, Defendant Bone acknowledged that the Plaintiff's act of standing in the yard at 105 Hinkle Road, which was the residence of Danny Avery, and the fact that Defendant Bone and Deputy Freeman did not make contact with the Plaintiff at his registered address did not give him probable cause to arrest the Plaintiff. (Doc. 58-3 at 10). Regarding the April 18, 2018, allegations, Defendant Bone acknowledged that not being able to

make contact with the Plaintiff at his registered address and viewing the Plaintiff's car at the Hinkle Road address did not give him probable cause to arrest the Plaintiff. (Doc. 58-3 at 10). Regarding the April 19, 2018, allegations, Defendant Bone acknowledged that, because Deputy Smitherman saw the Plaintiff's car at the Hinkle Road address and because Deputy Smitherman did not make contact with the Plaintiff at his registered address, he did have probable cause to arrest the Plaintiff. (Doc. 58-3 at 10). However, Defendant Bone acknowledged that it is not a crime for the Plaintiff to be standing in a friend's driveway at 10:30 at night, that it is not a crime for the Plaintiff's car to be parked at a friend's home at night, and it is not a crime for the Plaintiff to leave his home for nine minutes combined over three days (doc. 58-3 at 13-14); Defendant Bone acknowledges that, when conducting the home-compliance checks at the Plaintiff's registered address, he and other officers spent about two to three minutes at the Plaintiff's residence each of the three nights (doc. 58-3 at 11). Moreover, Defendant Bone acknowledged that he did not know whether the Plaintiff spent the night at his registered address on the three nights cited in the incident/offense report, that he did not know whether the Plaintiff was at his registered address before he arrived at the Plaintiff's registered address, and that he did not recall asking the Plaintiff where he stayed on the three nights cited in the incident/offense report. (Doc. 58-3 at 15).

On May 22, 2018, Defendant Bone obtained a warrant (the "first May 22, 2018, warrant") charging the Plaintiff with a ASORCNA violation pursuant to § 15-20A-11, Ala. Code 1975. (Doc. 61-4 at 5). The complaint that accompanied the first May 22, 2018, warrant provided, in pertinent part:

> On or about 4-17-18, James Edward Benjamin knowingly established a residence within 2000 feet of a school, childcare facility, or resident camp facility …, to-wit: spent more than three consecutive nights away from his listed address with Sheriff's Department in violation of [] [S]ection 15-20A-11 of the Code of Alabama 1975.

(Doc. 61-4 at 4). Defendant Bone acknowledged that the § 15-20A-11 charge in the first May 22, 2018, complaint was for failure to spend three consecutive nights at the Plaintiff's registered address. (Doc. 58-3 at 14). Although Defendant Bone testified that it was his usual practice to submit his incident/offense reports to the magistrate when he obtains warrants and that the magistrate then uses the narrative in the report to prepare the complaint to accompany the warrant, the court notes that the record is not clear as to whether Defendant Bone submitted the April 24, 2018, incident/offense report to the magistrate to incorporate into the complaint accompanying the first May 22, 2018, warrant. However, as explained *infra*, the court makes the reasonable inference that the April 24, 2018, incident/offense report was incorporated into the first May 22, 2018, warrant application.

The Plaintiff was arrested on May 22, 2018, after being pulled over in Chilton County for an equipment violation. (Doc. 61-4 at 6-8). The Plaintiff was charged

with distribution of a controlled substance, illegal possession of prescription drugs, and possession of drug paraphernalia. (Doc. 61-4 at 6). In addition to the aforementioned charges, the Plaintiff was arrested pursuant to the first May 22, 2018 warrant; the Plaintiff posted bond on May 25, 2018. (Doc. 58-8).

Defendant Bone also obtained another warrant on May 22, 2018 (the "second May 22, 2018, warrant"), charging the Plaintiff with a ASORCNA violation pursuant to § 15-20A-10, Ala. Code 1975. (Doc. 61-5 at 2). The complaint that accompanied the second May 22, 2018, warrant provided, in pertinent part:

> On or about 4-17-18, James Edward Benjamin knowingly failed to immediately in person register all required information with local law enforcement in each county in which the adult sex offender resides or intends to reside …, to-wit: failed to register his new address with the Chilton County Sheriff's Department in violation of [S]ection 15-20A-10 of the Code of Alabama 1975.

(Doc. 61-5 at 1). Defendant Bone acknowledged that the § 15-20A-10 charge in the second May 22, 2018, complaint was for failing to report another address. (Doc. 58-3 at 14).

The Plaintiff was arrested by Defendant Bone on June 13, 2018, at Danny Avery's residence located at 105 Hinkle Road pursuant to the second May 22, 2018, warrant. (Doc. 61-5 at 3). Defendant Bone acknowledged that he specifically withheld the second May 22, 2018, warrant because he "wanted to arrest [the Plaintiff] on that warrant at Danny Avery's house." (Doc. 58-3 at 18). Defendant Bone testified that, prior to the Plaintiff answering the door, Defendant Bone "could

see [the Plaintiff] laying on the couch" as he was knocking on Danny's Avery's door. (Doc. 58-3 at 19). Defendant Bone stated that, prior to going to the Plaintiff's registered address to conduct a home-compliance check in April 2018, Defendant Bone received a phone call on his work cell phone from Jimmie Hardee in which Mr. Hardee "knew [the Plaintiff] was a sex offender and wanted to know did he register that address of 105 Hinkle Road" as his registered address with law enforcement. (Doc. 58-3 at 34). According to Defendant Bone, Mr. Hardee had "seen [the Plaintiff] all the time at [Danny Avery's] house, evening time, leaving out early in the morning, and there was even an incident where [the Plaintiff] was peeking over the fence onto Jimmie's property." (Doc. 58-3 at 34). Defendant Bone testified in his deposition that the phone call he received from Mr. Hardee prompted him to start the investigation into the Plaintiff as to whether he was living at another address. (Doc. 58-3 at 35). However, the call logs submitted by Defendant Bone indicate that the first phone call from Mr. Hardee occurred on June 13, 2018, at 8:36 p.m. (Doc. 58-13).

Defendant Bone testified that Danny Avery provided him with a statement on June 13, 2018. (Doc. 58-3 at 21). When asked what Danny Avery told Defendant Bone the night of June 13, 2018, Defendant Bone testified as follows:

> The only thing I remember is what's in the report. He c[a]me out of the bedroom and I asked him did he know [the Plaintiff] was a sex offender and he said no, he didn't. And I asked him how long has [the Plaintiff] been staying there, and that's when he told me that. Then I asked him,

> Hey, would you put it on -- write it on a statement for me, and he said, I can't -- I can't read or write, but I can tell you what to put and I'll sign my name to it.

(Doc. 58-3 at 31). The statement of Danny Avery obtained by Defendant Bone provides, in pertinent part:

> Danny Avery stated to [Defendant Bone] that [the Plaintiff] went to a wedding in Montgomery Friday June 8th 2018. Danny Avery stated [the Plaintiff] came back to his residence Sunday around 4:00 pm. Danny Avery stated [the Plaintiff] stayed at his residence at 105 Hinkle Road Sunday night, Monday night, Tuesday night, and Wednesday night. Danny Avery stated he did not know [the Plaintiff] was a sex offender. This statement was written by [Defendant Bone] at the request of Danny Avery.

(Doc. 58-17 at 1-2). The statement is signed by both Danny Avery and Defendant Bone. Further, in an affidavit signed by Danny Avery on July 5, 2018, Danny Avery stated that, to his knowledge, "on nights [he] went to bed before [the Plaintiff] left, [the Plaintiff] would leave [his] home in the early morning hours after [the Plaintiff] came to shower, eat and relax." (Doc. 58-19 at 3). However, Danny Avery's deposition contradicts the statement he was alleged to have given Defendant Bone on the night of June 13, 2018. (*See* Doc. 65-5). In his deposition, Danny Avery testified that he "didn't see [the Plaintiff] that Sunday" after the wedding. (Doc. 65-5 at 5). Danny Avery further indicated that the assertion that the Plaintiff stayed at Danny Avery's residence Sunday night, Monday night, Tuesday night, and Wednesday night was untrue and that he did not tell Defendant Bone that information. (Doc. 65-5 at 5). Moreover, when shown the piece of paper on which

his statement was written, Danny Avery testified that he "ain't never seen that piece of paper" and that the paper he remembered from June 13, 2018, was "one piece of paper" and "was notebook paper like you take to school." (Doc. 65-5 at 5).

When asked about the night that he was arrested at Danny Avery's residence, the Plaintiff testified that he "left from [his] house, went over [to Danny Avery's residence], ate, [and] showered. [Danny Avery] was back in the bedroom." (Doc. 58-2 at 10). The Plaintiff testified that he saw Defendant Bone peeping in the window and the Plaintiff "got up" and '[o]pened the door. That's when he shoved me into the wall, and they handcuffed me, talking about I ain't where I'm supposed to be." (Doc. 58-2 at 10). The Plaintiff stated that he "was living in a tent … in the country … [b]ecause [his] van was tore up." (Doc. 58-2 at 10). The Plaintiff testified that he would go over to Danny Avery's residence to "take a shower, eat a hot meal, sit and watch TV. Sometimes [Danny Avery] would go to bed, and then I would leave and go home." (Doc. 58-2 at 10). Further, the Plaintiff testified that Danny Avery "was a friend of [his]. He stays in town. He knows me. He know[s] my situation. He ain't got no problem. We've been friends for about ten, fifteen years." (Doc. 58-2 at 11). The Plaintiff testified that he has spent the night at Danny Avery's residence but that it was not more than one night in a row. (Doc. 58-2 at 11).

On June 15, 2018, Defendant Bone obtained another warrant charging the Plaintiff with a ASORCNA violation pursuant to § 15-20A-11, Ala. Code 1975. (Doc. 61-6 at 2). The complaint that accompanied the June 15, 2018, warrant provided, in pertinent part:

> On or about 6-13-18, James Edwards Benjamin knowingly established a residence within 2000 feet of a school, childcare facility, or resident camp facility …, to-wit: established a residence at 105 Hinkle Rd, Clanton, AL 35045 near West End Baptist Church Day Care in violation of [S]ection 15-20A-11 of the Code of Alabama 1975.

(Doc. 61-6 at 1). The incident/offense report Defendant Bone used to obtain the June 15, 2018, warrant provides, in pertinent part:

> On June 13, 2018, around 5:00 PM, I was contacted by Jimmie Hardee about a registered sex offender, James Benjamin, residing at 105 Hinkle Road, Clanton, AL. Around 11:30 PM, Officer McCartney, Deputy Smitherman and myself went to 105 Hinkle Road to make contact with James Benjamin. I knocked on the front door of the residence and James Benjamin opened the door. I advised James Benjamin that he was under arrest for an outstanding warrant for failure of adult sex offender to register with local law enforcement (WR-2018-1131). … I asked James Benjamin was anyone else in the house. James Benjamin stated Danny Avery was asleep in the bedroom. I made contact with Danny Avery and advised him the reason for being at his address. Danny Avery stated he could provide a written statement if I would write it for him. The statement from Danny Avery stated that James Benjamin went to a wedding in Montgomery Friday June 8th, 2018. Danny Avery stated James Benjamin came back to his residence Sunday around 4:00 PM. Danny Avery stated James Benjamin stayed at his residence at 105 Hinkle Road Sunday night, Monday night, Tuesday night and Wednesday night. Danny Avery stated he did not know James Benjamin was a sex offender. I then determined that James Benjamin established a residence and living accommodation within 2000 feet of a daycare. 105 Hinkle Road is a restricted address due to two daycares being within 2000 feet. I checked the measurement by

> using Google maps. The distance from [the] nearest property line of 105 Hinkle Road to the nearest property line of West End Church is 110 feet. I also measured the distance from [the] nearest property line of 105 Hinkle Road to the nearest property line of 501 Littlejohn Road which is 1,725 feet. West End Church and We Care Day Care and Learning Center [are] within 2000 feet from 105 Hinkle Road.

(Doc. 58-20 at 2-3). Defendant Bone acknowledged that the information in the June 2018 incident/offense report was used to obtain the June 15, 2018, warrant. (Doc. 58-3 at 19). Defendant Bone further testified that the information in his incident/offense report was presented to the magistrate and then the magistrate issued a warrant based on that information. (Doc. 58-3 at 20). However, the incident/offense report indicates that it was prepared on July 3, 2018, and, when asked about that inconsistency, Defendant Bone testified that it "[m]ust be the wrong date at the top of it." (Doc. 58-3 at 22).

The record reflects that, following his June 13, 2018, arrest, the State of Alabama filed a Motion to Revoke Bond in the Plaintiff's pending cases (doc. 61-7 at 1-2); that motion was granted by the District Court of Chilton County, Alabama on June 18, 2018 (doc. 61-7 at 3). The Plaintiff was then arrested and held without bond on October 15, 2018 (doc. 61-7 at 4); the Plaintiff's defense attorney filed several Motions to Reinstate Bond which were finally granted by the District Court of Chilton County, Alabama on June 13, 2019. (Doc. 61-8 at 11). The record further indicates that two of the Plaintiff's ASORCNA violation charges were no billed by the Chilton County Grand Jury on October 31, 2019, and that the District Court of

Chilton County, Alabama dismissed the Plaintiff's remaining ASORCNA violation charge on motion of the State of Alabama on November 26, 2019. (Doc. 61-9 at 1-3).

## III. Discussion

In his brief in support of his Motion for Summary Judgment, Defendant Bone states that he is "entitled to qualified immunity from Plaintiff's claims" and that the court "must grant Defendants' Motion for Summary Judgment … as to Counts I-III." (Doc. 59 at 16, 33). In his response in opposition to Defendant Bone's Motion for Summary Judgment, the Plaintiff states that the court should deny Defendant Bone's Motion for Summary Judgment as to Counts I, II, and III "because the undisputed material facts, viewed in the light most favorable to [the Plaintiff], show that [Defendant] Bone violated [the Planitiff's] clearly established rights when he arrested [the Plaintiff] pursuant to the First May 22 Warrant, the Second May 22 Warrant, and the June 15 Warrant." (Doc. 65 at 14-15).

"Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). Based on the Plaintiff's allegations, he seeks to hold Defendant Bone liable for conduct committed while

performing his discretionary duties.[1] Therefore, the burden has shifted to the Plaintiff to show that Defendant Bone is not entitled to qualified immunity. *See Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). To satisfy this burden, the Plaintiff must establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

**A. Defendant Bone's and the Plaintiff's Cross Motions for Summary Judgment on the Plaintiff's Malicious Prosecution Claims**

To establish a federal malicious prosecution claim pursuant to 42 U.S.C. § 1983, "a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of h[is] Fourth Amendment right to be free of unreasonable seizures." *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019) (internal citations omitted). "[T]he constituent elements of the common law tort of malicious prosecution include[]: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Id*. (quoting *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003)).

[1] In his response to Defendant Bone's Motion for Summary Judgment, the Plaintiff agrees that Defendant Bone "was acting within the scope of his discretionary authority when he arrested [the Plaintiff]" and agrees that it is now the Plaintiff's "burden to show that [Defendant] Bone violated [the Plaintiff's] clearly established constitutional rights." (Doc. 65 at 15 n.4).

"Although the lawfulness of a warrantless arrest turns on whether the arresting officer had probable cause, … the lawfulness of seizures pursuant to legal process turns on the validity of the legal process itself." *Williams v. Aguirre*, 965 F.3d 1147, 1162 (11th Cir. 2020). "In the context of arrest warrants, for example, an officer ordinarily does not violate the Fourth Amendment when he executes a facially valid arrest warrant, regardless of whether the facts known to the officer support probable cause." *Id*. Instead, the Supreme Court of the United States "has instructed courts to examine whether 'the judicial officer issuing such a warrant [was] supplied with sufficient information to support an independent judgment that probable cause exists for the warrant.'" *Id*. (quoting *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971)). Thus, "seizures pursuant to legal process concern whether the judicial officer who approved the seizure had sufficient information to find probable cause." *Id*. at 1163. Moreover, to meet his burden to prove a violation of his Fourth Amendment right to be free of unreasonable seizures, "a plaintiff must establish (1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Id*. at 1165.

"A *warrant-based* arrest ordinarily requires the supporting affidavit to provide probable cause for the *specific crime* for which the detainee was arrested." *Land v. Sheriff of Jackson Cnty. Fla.*, 85 F.4th 1121, 1127 (11th Cir. 2023) (emphasis in

original). When evaluating a warrant-based malicious prosecution claim, the court considers the warrant affidavit and should "excise any intentional or reckless misstatements in the affidavit: where an officer makes an 'intentional' or 'reckless misstatement,' [the court] evaluate[s] 'whether probable cause would be negated if the offending statement was removed.'" *Id*. (quoting *Paez*, 915 F.3d at 1287). The court asks whether the Plaintiff has produced enough to establish "either 'that the officer who applied for the warrant should have known that his application failed to establish probable cause' or 'that an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or omissions necessary to support the warrant.'" *Laskar v. Hurd*, 972 F.3d 1278, 1296 (11th Cir. 2020) (quoting *Williams*, 965 F.3d at 1165). Moreover, "the warrant 'do[es] nothing to satisfy the Fourth Amendment's probable-cause requirement' when the judge was presented with materially incorrect information." *Land*, 85 F.4th at 1126 (quoting *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 367, 137 S. Ct. 911, 919, 197 L. Ed. 2d 312 (2017)).

In the context of qualified immunity,

> the law was clearly established in 1993 that the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen and, thus, that qualified immunity will not shield [an officer] from liability for such false statements, if such false statements were necessary to the probable cause.

*Jones v. Cannon*, 174 F.3d 1271, 1285 (11th Cir. 1999) (citing *Malley v. Briggs,* 475 U.S. 335, 344–45, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, …, will the shield of immunity be lost." *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1098, 89 L. Ed. 2d 271 (1986). Conversely, "if the affidavit[] … would have demonstrated even arguable probable cause -- that a reasonable officer *could have* believed an offense was committed -- then the officers are entitled to qualified immunity." *Paez*, 915 F.3d at 1288 (emphasis in original); *see Malley*, 475 U.S. at 341 ("[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized.").

The Eleventh Circuit has stated that "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1257 (11th Cir. 2010) (citing *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 735 (11th Cir. 2010)). "Arguable probable cause exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff.'" *Id*. Moreover, "'it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable.'" *Id*. (quoting *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)). Thus,

because this is a warrant-based malicious prosecution claim rather than a warrantless-arrest claim, arguable probable cause is not measured by the "any offense" rule that governs false-arrest claims. The Eleventh Circuit has held that "[r]egardless of its applicability to warrantless arrests, the any-crime rule does not apply to claims of malicious prosecution under the Fourth Amendment." *Williams*, 965 F.3d at 1162.

The crux of both the Plaintiff's and Defendant Bone's arguments before the court hinges on whether Defendant Bone had at least arguable probable cause to obtain the warrants against the Plaintiff for violations under the Alabama Sex Offender Registration and Community Notification Act. In his Motion for Summary Judgment, Defendant Bone asserts that, when "considering the specific statutes, the information Defendant Bone possessed, and the magistrate judge's issuance of the warrants, Defendant Bone had arguable probable cause to arrest the Plaintiff for the various ASORCNA violations alleged in the Plaintiff's Second Amended Complaint." (Doc. 59 at 27-28). The Plaintiff however asserts in his Motion for Partial Summary Judgment that "none of the warrants, on their face, established probable cause to arrest [the Plaintiff] for the crimes charged, so [Defendant] Bone should have known that each of the warrants [were] constitutionally infirm." (Doc. 62 at 19). Further, the Plaintiff contends that "both of the May 22 warrants contain statements by [Defendant] Bone that were, at the very least, recklessly false; with

those misstatements excised, the warrants even more obviously failed to establish probable cause." (Doc. 62 at 19).

**1. The First May 22, 2018, Warrant**

The first May 22, 2018, warrant charged the Plaintiff with violating § 15-20A-11 of the Code of Alabama and stated that the Plaintiff "spent more than three consecutive nights away from his listed address with [the] Sheriff's Department." (Doc. 61-4 at 4). The court notes that, when viewing the first May 22, 2018, warrant case file, the April 24, 2018, incident/offense report, the complaint, and warrant all contain the same Alacourt "Document 28" designation at the top of the scanned page. (*See* Doc. 61-4 at 1-5). Thus, the court finds there is a reasonable inference from the documents submitted that the April 24, 2018, incident/offense report, the complaint, and the warrant were all given to the magistrate when Defendant Bone obtained the first May 22, 2018, warrant, and, as such, the court finds that the April 24, 2018, incident/offense report was incorporated as part of the first May 22, 2018, warrant application.

The April 24, 2018, incident/offense report provides the following: On April 17, 2018, the Plaintiff was observed at 105 Hinkle Road along with his car and officers were unable to make contact with the Plaintiff at his registered address that night; on April 18, 2018, the Plaintiff's car was observed in the driveway at 105 Hinke Road and officers were unable to make contact with the Plaintiff at his

registered address that night; and on April 19, 2018, the Plaintiff's car was observed at 105 Hinkle Road and officers were unable to make contact with the Plaintiff at his registered address. (Doc. 61-4 at 1-3). Defendant Bone's April 24, 2018, incident/offense report concludes that the Plaintiff "failed to spend 3 consecutive nights at his registered address and has failed to notify the Chilton County Sheriff's Office of another address." (Doc. 61-4 at 3).

While relying on his April 24, 2018, incident/offense report, Defendant Bone contends that, in violation of § 15-20A-11, Ala. Code 1975, "it was objectively reasonable for Defendant Bone to believe that [the] Plaintiff could have 'spen[t] more than four hours a day at [Mr. Avery's residence] on three or more consecutive days.'" (Docs. 59 at 29-30, 61-4 at 1-3). The Plaintiff contends that Defendant Bone's affidavit supporting the first May 22, 2018, warrant was "premised on three home[-]compliance checks [Defendant] Bone or another [Chilton County Sheriff's Office] Deputy conducted at [the Plaintiff's] registered address on April 17, 18, and 19, 2018," in which they "spent about two or three minutes at [the Plaintiff's] residence." (Doc. 60 at 25).

On Defendant Bone's motion, while viewing the facts in the light most favorable to the Plaintiff, the court determines that a jury could find that Defendant Bone made materially reckless misstatements in order to obtain the first May 22, 2018, warrant. In his deposition, Defendant Bone acknowledged that the officers

spent only two to three minutes at the Plaintiff's registered address during the home-compliance checks and that Defendant Bone did not know whether the Plaintiff slept at his registered address or at 105 Hinkle Road. Yet the complaint stated definitively that the Plaintiff "spent more than three consecutive nights away from his listed address." (Doc. 61-4 at 4). Thus, a jury could find that Defendant Bone made this statement with reckless disregard for its truth rather than having a reasonable basis to believe the factual statement was true. *See Franks v. Delaware*, 438 U.S. 154, 165 (1978) (information put forth in a warrant should be "believed or appropriately accepted by the affiant as true.").

Further, Defendant Bone testified that Jimmie Hardee called him prior to Defendant Bone going to the Plaintiff's registered address on April 17, 2018, and told him that the Plaintiff had been at 105 Hinkle Road in the evenings and left early in the morning. (Doc. 61-3 at 34). However, the phone records provided to the court indicate that Defendant Bone did not receive a call from Jimmie Hardee on Defendant Bone's work cellular phone until June 13, 2018. (*See* Doc. 65-4). The deposition of Defendant Bone also mentions an affidavit provided by Jimmie Hardee on September 3, 2023 (*see* doc. 61-3 at 29), however, the court notes that Jimmie Hardee's alleged affidavit does not appear in the record before the court. Thus, the court finds that a jury could find that Defendant Bone did not receive a call from Jimmie Hardee prior to April 17, 2018. Defendant Bone not receiving a call from

Jimmie Hardee coupled with the testimony that Defendant Bone did not know whether the Plaintiff spent the night at his registered address or at 105 Hinkle Road could allow a jury to find that Defendant Bone lacked a reasonable basis to state in his complaint that the Plaintiff failed to spend three consecutive nights at his registered address.

If a jury were to excise those reckless misstatements, all that remains to support probable cause is that the Plaintiff was seen standing at 105 Hinkle Road, the Plaintiff's car was seen parked at 105 Hinkle Road, and that officers were not able to make contact with the Plaintiff at his registered address during their brief home-compliance checks. A jury could find that these facts alone would not provide a reasonably well-trained officer in the Defendant's position with a basis to believe that he had probable cause, or even arguable probable cause, to apply for the first May 22, 2018, warrant. *See Garmon v. Lumpkin Cnty, GA.*, 878 F.2d 1406, 1409 (11th Cir. 1989) (finding that a "magistrate could not possibly have conducted the independent assessment required by the fourth amendment" because the "affidavit contained nothing but the investigator's conclusion."). As such, the court finds that Defendant Bone's Motion for Summary Judgment is due to be denied as to the first May 22, 2018, warrant.

However, on the Plaintiff's motion, the court views the facts in the light most favorable to Defendant Bone. The Supreme Court has noted that when a fact "is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). Here, Defendant Bone testified that he received a phone call from Jimmie Hardee which prompted Defendant Bone to initiate an investigation into the Plaintiff in April 2018. However, as noted above, the call logs submitted to the court indicate that the first phone call from Jimmie Hardee occurred on June 13, 2018, at 8:36 p.m. (Doc. 58-13). Thus, no reasonable jury could find that Defendant Bone received a phone call from Jimmie Hardee prior to the April 24, 2018, incident/offense report.

As explained above, a jury could find that the April 24, 2018, incident/offense report was incorporated into the first May 22, 2018, warrant application. That April 24, 2018, incident/offense report provided that Defendant Bone observed the Plaintiff and his vehicle at 105 Hinkle Road on April 17, 2018, and that officers were unable to make contact with the Plaintiff at his registered address on three consecutive nights while his car was observed at 105 Hinkle Road on those nights. Viewing those facts in the light most favorable to Defendant Bone, a jury could find that the information provided to the magistrate would give a reasonably well-trained officer in the Defendant's position at least arguable probable cause to apply for the first May 22, 2018, warrant because reasonable officers could at least disagree about

whether the information established probable cause. As such, the court finds that the Plaintiff's Partial Motion for Summary Judgment is due to be denied as to the first May 22, 2018, warrant.

Accordingly, in viewing the facts in the light most favorable to the non-moving party on each motion, the court finds that a genuine issue of material fact exists as to whether Defendant Bone committed a constitutional violation in obtaining the first May 22, 2018, warrant.

**2. The Second May 22, 2018, Warrant**

The second May 22, 2018, warrant charged the Plaintiff with violating § 15-20A-10 of the Code of Alabama and stated that the Plaintiff "failed to register his new address with the Chilton County Sheriff's Department." (Doc. 61-5 at 1-2). Unlike the first May 22, 2018, warrant, the second May 22, 2018, warrant does not share the same Alacourt document number as the April 24, 2018, incident/offense report. The only documents before the court accompanying the second May 22, 2018, warrant are the complaint, an Alabama Uniform Arrest Report, and the Plaintiff's consolidated bond information. (*See* Doc. 61-5 at 1-5). The second May 22, 2018, warrant and the complaint bear the same "Document 1" designation at the top, while the Alabama Uniform Arrest Report bears a "Document 2" designation and the Plaintiff's consolidated bond information bears a "Document 3" designation. As such, the court does not make the same reasonable inference as it did above with

the first May 22, 2018, warrant that the April 24, 2018, incident/offense report was incorporated into the second May 22, 2018, warrant application.

Defendant Bone argues that "it was reasonable … to believe that [the] Plaintiff had established a new address at 105 Hinkle Road then failed to register that new address." (Doc. 59 at 32). The Plaintiff argues that Defendant Bone's testimony establishes that he did not have sufficient or substantial evidence to support his statement that the Plaintiff failed to register his new address with the Chilton County Sheriff's Department. (Doc. 62 at 27). Further, the Plaintiff argues that, while viewing the facts in the light most favorable to the Plaintiff, the statement in Defendant Bone's affidavit supporting the second May 22, 2018, warrant was "at the very least, recklessly false." (Doc. 62 at 27).

On Defendant Bone's motion, while viewing the facts in the light most favorable to the Plaintiff, a jury could find that the April 24, 2018, incident/offense report was not given to the magistrate and was not made part of the second May 22, 2018, warrant application. On that finding, without the April 24, 2018, incident/offense report, all that accompanied the second May 22, 2018, warrant was the complaint that states that the Plaintiff "failed to register his new address with the Chilton County Sheriff's Department" (doc. 61-5 at 1) without an explanation of how Defendant Bone came to that determination. A jury could find that Defendant Bone had no factual basis for determining that the Plaintiff failed to register a new

address because Defendant Bone testified that he did not know whether the Plaintiff was at his registered address before or after he and other officers attempted to conduct the home checks and Defendant Bone did not know where the Plaintiff slept on those three consecutive nights in question. (*See* Doc. 61-3 at 13, 15). Furthermore, as stated above, a jury could find that Defendant Bone did not receive a call from Jimmie Hardee prior to April 17, 2018, which would have prompted him to begin his investigation into the Plaintiff. Thus, a jury could find that Defendant Bone made a reckless misstatement when he stated that the Plaintiff failed to register a new address and, with that statement excised from the complaint, no factual statement remains in the complaint to support the warrant. As such, Defendant Bone would lack immunity because "a reasonably well-trained officer in [Defendant Bone's] position would have known that his affidavit failed to establish probable cause" and would create an "unnecessary danger of an unlawful arrest." *Malley*, 475 U.S. at 345.

However, on the Plaintiff's motion, while viewing the facts in the light most favorable to Defendant Bone, the court determines that, as noted above, no reasonable jury could find that Jimmie Hardee called Defendant Bone prior to the April 24, 2018, incident/offense report. Nonetheless, a reasonable jury could find that, in conformity with his usual practice of supplying the magistrate with his incident/offense report, Defendant Bone provided the magistrate with the April 24,

2018, incident/offense report when obtaining the second May 22, 2018, warrant. A jury could find that a reasonably well-trained officer would believe that he had probable cause to apply for the second May 22, 2018, warrant based on the officers' failure to make contact with the Plaintiff on the three consecutive nights and the officers' observations that the Plaintiff's vehicle was in the driveway of 105 Hinkle Road on the three consecutive nights in question. Viewing those facts in the light most favorable to Defendant Bone, a jury could find that the information provided to the magistrate would give a reasonably well-trained officer in the Defendant's position at least arguable probable cause to apply for the second May 22, 2018, warrant based on the belief that the Plaintiff failed to register a new address with the Chilton County Sheriff's Department and because reasonable officers could at least disagree about whether that information established probable cause. As such, the court finds that the Plaintiff's Partial Motion for Summary Judgment is due to be denied as to the second May 22, 2018, warrant.

Accordingly, in viewing the facts in the light most favorable to the non-moving party on each motion, the court finds that a genuine issue of material fact exists as to whether Defendant Bone committed a constitutional violation in obtaining the second May 22, 2018, warrant.

**3. The June 15, 2018, Warrant**

The June 15, 2018, warrant charged the Plaintiff with violating § 15-20A-11 of the Code of Alabama and stated that the Plaintiff "established a residence at 105 Hinkle Rd, Clanton, AL 35045 near West End Baptist Church Day Care." (Doc. 61-6 at 1). Defendant Bone contends that he

> had arguable probable cause to arrest [the] Plaintiff for a violation of § 15-20A-11 on June 15, 2018, … [because] [t]he facts known to Defendant Bone prior to arresting [the] Plaintiff on [that] date include: (1) receiving a call from Mr. Avery's neighbor who stated that [the] Plaintiff was "basically living" at 105 Hinkle Road, …; (2) [the] Plaintiff laying on Mr. Avery's couch with a pillow, …, and his pants off, …; (3) testimony from Mr. Avery that [the] Plaintiff "had come to [his] home at various times over the past week[,]" …; and (4) testimony from Mr. Avery that [the] Plaintiff "would leave [his] home in the early morning hours after he came to shower, eat and relax."

(Doc. 59 at 30-31). However, evidence in the record contradicts Defendant Bone's assertions in that the court finds a genuine issue of material fact exists. The record reflects that Mr. Avery testified that he had never seen the piece of paper on which his statement was written and that he never told Defendant Bone that the Plaintiff had stayed at Mr. Avery's house consecutive nights. (*See* Doc. 65-5 at 5). Further, the incident/offense report provided to the magistrate by Defendant Bone in support of the June 15, 2018, warrant was dated July 3, 2018, which would indicate that the information—or at least part of the information—may not have been used in the complaint to support the June 15, 2018, warrant. When asked about the date

discrepancy, Defendant Bone testified that it "[m]ust be the wrong date at the top of it." (Doc. 58-3 at 22).

As stated above, the statement of Danny Avery obtained by Defendant Bone provides, in pertinent part:

> Danny Avery stated to [Defendant Bone] that [the Plaintiff] went to a wedding in Montgomery Friday June 8th 2018. Danny Avery stated [the Plaintiff] came back to his residence Sunday around 4:00 pm. Danny Avery stated [the Plaintiff] stayed at his residence at 105 Hinkle Road Sunday night, Monday night, Tuesday night, and Wednesday night. Danny Avery stated he did not know [the Plaintiff] was a sex offender. This statement was written by [Defendant Bone] at the request of Danny Avery.

(Doc. 58-17 at 1-2). However, Danny Avery testified that he "didn't see [the Plaintiff] that Sunday" after the wedding (doc. 65-5 at 5), and that the assertion that the Plaintiff stayed at Danny Avery's residence Sunday night, Monday night, Tuesday night, and Wednesday night was untrue and that he did not tell Defendant Bone that information. (Doc. 65-5 at 5). Further, Danny Avery testified that he "ain't never seen that piece of paper" and that the paper he remembered from June 13, 2018, was "one piece of paper" and "was notebook paper like you take to school." (Doc. 65-5 at 5). Moreover, the Plaintiff testified that he would go over to Danny Avery's residence to "take a shower, eat a hot meal, sit and watch TV. Sometime [Danny Avery] would go to bed, and then I would leave and go home" (doc. 58-2 at 10), and that he has spent the night at Danny Avery's residence but that it was not more than one night in a row. (Doc. 58-2 at 11).

On Defendant Bone's motion, while viewing the facts in the light most favorable to the Plaintiff, the court determines that a jury could believe the Plaintiff and Danny Avery. A jury could find that, because of the date discrepancy between the date that the June 15, 2018, warrant was obtained and the July 3, 2018, date that appears on the June 2018 incident/offense report, Defendant Bone did not use the June 2018 incident/offense report to obtain the June 15, 2018, warrant. If a jury determines that the June 2018 incident/offense report was not incorporated into the June 15, 2018, warrant application, all that would have been available to obtain the June 15, 2018, warrant would be the complaint. Moreover, if a jury believes the testimony of the Plaintiff and Danny Avery, a jury could find that Defendant Bone's statement that the Plaintiff had "established a residence" was a reckless misstatement. Furthermore, even considering that Jimmie Hardee called Defendant Bone on June 13, 2018, Defendant Bone testified that Jimmie Hardee's phone call did not give him probable cause to arrest the Plaintiff; Defendant Bone testified that Jimmie Hardee's phone call only caused him to start his investigation of the Plaintiff. (Doc. 58-3 at 35). Thus, if a jury were to excise Defendant Bone's statement that the Plaintiff had "established a residence" at 105 Hinkle Road, the complaint would contain no factual basis to determine that the Plaintiff had established a new residence at a prohibited location. As such, no reasonably well-trained officer could have believed that the warrant application supplied the magistrate with probable

cause, or even arguable probable cause, and Defendant Bone would lack immunity because "a reasonably well-trained officer in [Defendant Bone's] position would have known that his affidavit failed to establish probable cause" and would create an "unnecessary danger of an unlawful arrest." *Malley*, 475 U.S. at 345.

However, on the Plaintiff's motion, while viewing the facts in the light most favorable to Defendant Bone, the court determines that a jury could believe Defendant Bone's testimony that the June 2018 incident/offense report was presented to the magistrate and that the July 3, 2018, date was the wrong date. Further, a jury could credit Defendant Bone's testimony that he presented the June 2018 incident/offense report to the magistrate to obtain the June 15, 2018, warrant. Moreover, a jury could credit Defendant Bone and believe the written statement obtained by Defendant Bone from Danny Avery stating that the Plaintiff stayed at Danny Avery's residence on four consecutive nights. Defendant Bone's assertion that the June 2018 incident/offense report was used to obtain the June 15, 2018, warrant as well as Danny Avery's statement written by Defendant Bone, the fact that Defendant Bone testified that he saw the Plaintiff on Danny Avery's couch when he knocked on the door, and Defendant Bone's testimony that he received a call from Jimmie Hardee indicating that the Plaintiff was basically living at Danny Avery's residence could lead a jury to determine that Defendant Bone had a good-faith basis for believing that the Plaintiff had established a residence at Danny Avery's address

which was a prohibited location for the Plaintiff to reside. Thus, a jury could find that Defendant Bone did not make a reckless misstatement and supplied the magistrate with enough information that a reasonably well-trained officer could have believed that the warrant application established that at least arguable probable cause existed for the June 15, 2018, warrant, which would entitle Defendant Bone to qualified immunity. *See Williams*, 965 F.3d at 1162.

Accordingly, in viewing the facts in the light most favorable to the non-moving party on each motion, the court finds that a genuine issue of material fact exists as to whether Defendant Bone committed a constitutional violation in obtaining the June 15, 2018, warrant.

**4. Malice**

"[T]he absence of probable cause allow[s] a jury to infer malice for the common-law tort of malicious prosecution. *Luke v. Gulley,* 50 F.4th 90, 97 (11th Cir. 2022). As stated above, "the constituent elements of the common law tort of malicious prosecution include[]: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Paez*, 915 F.3d at 1285 (quoting *Wood*, 323 F.3d at 882). Here, it is undisputed that the Plaintiff had a criminal prosecution instituted against him by Defendant Bone and that the criminal prosecution terminated in the Plaintiff's favor

because the three separate charges were ultimately dismissed (*see* doc. 61-9 at 1-3). *See Thompson v. Clark*, 596 U.S. 36, 49 (2022) (finding that criminal prosecutions terminate in the plaintiff's favor when "the criminal prosecution ended without a conviction.").

As to the damages element of a claim for malicious prosecution, when a Plaintiff "complains he was seized in violation of the Fourth Amendment, the relevant injury is the seizure that followed the arrest warrant." *Williams*, 965 F.3d at 1167. Here, the record establishes that the Plaintiff was arrested and detained on the warrants obtained by Defendant Bone. The Plaintiff was arrested on May 22, 2018, and released on bond on May 25, 2018. (*See* Doc. 61-5 at 3). The Plaintiff was again arrested on June 13, 2018, (*see* doc. 61-5 at 3), and his bond was revoked on June 18, 2018. The Plaintiff was then held without bond and was released when his bond was reinstated on June 13, 2019. (*See* Doc. 61-8 at 11). The Plaintiff also testified that his vehicle was impounded and sold while he was incarcerated on these warrants, that he lost his job, his clothes, his money, and that he lost "everything [he] ever had." Further, the Plaintiff testified that his home was damaged while he was incarcerated on these warrants, his motorcycle was stolen, and that he has headaches, stress and worry caused by the arrests associated with these warrants. (*See* Doc. 58-2 at 18, 22, 24). Thus, nominal damages remain for a jury to determine based on the Plaintiff's injury. *See Carey v. Piphus*, 435 U.S. 247, 266, 98 S. Ct. 1042, 1054, 55

L. Ed. 2d 252 (1978) (finding that "the denial of procedural due process should be actionable for nominal damages without proof of actual injury.").

Moreover, since an absence of probable cause allows a jury to infer malice for a claim of malicious prosecution, on the Plaintiff's motion, a jury could find that a reasonably well-trained officer had probable cause, or at least arguable probable cause, to obtain the warrants and, as such, eliminates the malice element and defeats the Plaintiff's malicious prosecution claim. However, on Defendant Bone's motion, a jury could find that a reasonably well-trained officer neither had probable cause nor arguable probable cause to obtain the warrants. As such, Defendant Bone would lack immunity because "a reasonably well-trained officer in [Defendant Bone's] position would have known that his affidavit failed to establish probable cause" and would create an "unnecessary danger of an unlawful arrest." *Malley*, 475 U.S. at 345. Thus, since a genuine issue of material fact exists as to whether Defendant Bone committed a constitutional violation in obtaining the warrants, the element of malice depends on whether a jury finds in favor of the Plaintiff or Defendant Bone.

**5. Clearly Established Law**

Although the court has found that a genuine issue of material fact exists as to whether a reasonable jury could conclude that a constitutional violation occurred, the court's inquiry as to whether Defendant Bone is entitled to qualified immunity does not end here. As the Eleventh Circuit has stated, "[t]he unconstitutionality of

the defendant's particular conduct must have been clearly established at the time of the violation." *Hughes v. Locure*, 166 F. 4th 121, 128 (11th Cir. 2026). "'[T]he salient question … is whether the state of the law' at the time of the violation gave officials 'fair warning' that their conduct was unconstitutional." *Id*. (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). "The notice must be clear to 'every reasonable official,' and it must place the law 'beyond debate.'" *Id*. (quoting *Ashcroft*, 563 U.S. at 741).

The Eleventh Circuit has recognized that three ways exist in which a Plaintiff can show that a right is clearly established for qualified immunity purposes:

> "(1) by pointing to a materially similar decision of the Supreme Court, of this Court, or of the supreme court of the state in which the case arose; (2) by establishing that a broader, clearly established principle should control the novel facts of the case; or (3) by convincing us that the case is one of those rare ones that fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary."

*Id*. (quoting *Powell v. Snook*, 25 F. 4th 910, 920 (11th Cir. 2022)). "Under methods (2) and (3), [the court] look[s] for 'obvious clarity'—'a principle or provision so clear that, even without specific guidance from a decision involving materially similar facts, the unlawfulness of the officer's conduct is apparent.'" *Id*.

In his brief in support of his Motion for Partial Summary Judgment, the Plaintiff states that the "law has been clearly established for decades that qualified immunity does not protect an officer who caused someone 'to be unconstitutionally

arrested by presenting a judge with a complaint and a supporting affidavit which failed to establish probable cause.'" (Doc. 62 at 30-31) (quoting *Malley*, 475 U.S. at 337). However, Defendant Bone states that this court should deny the Plaintiff's Motion for Partial Summary Judgment because Defendant Bone's actions were not clearly established violations of law and "[b]ecause Plaintiff cannot present 'any already existing law that clearly established—beyond debate—the unlawfulness of [the] arrest[s] under the circumstances presented here.'" (Doc. 64 at 21) (quoting *Gates v. Khokhar*, 884 F. 3d 1290, 1303 (11th Cir. 2018)).

Defendant Bone asserts, and the Plaintiff does not rebut, that the Plaintiff "cannot cite any materially similar cases because there is no U.S. Supreme Court, Eleventh Circuit, or Alabama Supreme Court binding precedent analyzing arguable probable cause in the context of an arrest based on §§ 15-20A-10 and 15-20A-11." (Doc. 64 at 19). However, the Plaintiff mainly relies on *Malley v. Briggs* and *Garmon v. Lumpkin County, Georgia* for his argument that a clearly established violation of law exists, and the Eleventh Circuit has held that both cases "clearly establish that a police officer is not protected by qualified immunity if he applies for an arrest warrant where 'a reasonably well-trained officer … would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" *Pickens v. Hollowell*, 59 F. 3d 1203, 1207 (11th Cir. 1995) (quoting *Garmon*, 878 F. 2d at 1410)). Thus, in reliance on the caselaw stated above,

the court finds that the Plaintiff cites to *Malley* and *Garmon* to establish that a broader, clearly established principle should control the novel facts of the case and, as such, the court looks for "obvious clarity" that the "unlawfulness of the officer's conduct is apparent." *Hughes*, 166 F. 4th at 128. Further, as stated above, the Eleventh Circuit, relying on *Malley*, stated that, in terms of qualified immunity,

> the law was clearly established in 1993 that the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen and, thus, that qualified immunity will not shield [an officer] from liability for such false statements, if such false statements were necessary to the probable cause.

*Jones*, 174 F.3d at 1285 (citing *Malley,* 475 U.S. at 344–45).

Moreover, the Eleventh Circuit has reaffirmed this rule since the 2018 warrants were obtained by Defendant Bone. In *Laskar v. Hurd*, the Eleventh Circuit stated that it has long held "that officials violate the Fourth Amendment if they knowingly or recklessly make 'false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen ... if such false statements were necessary to the probable cause.'" *Laskar*, 972 F.3d at 1297 (citing *Jones*, 174 F.3d at 1285).

Accordingly, because this court has found that a reasonable jury could find either that Defendant Bone failed to supply the magistrate with sufficient information to support an independent judgment by the magistrate that probable cause existed, or that Defendant Bone obtained the warrants through knowingly or

recklessly false misstatements, the court finds that a reasonably well-trained officer in the same circumstances would have known that the "affidavit failed to establish probable cause and that he should not have applied for the warrant[s]." *Pickens*, 59 F. 3d at 1207. Such a finding that the information provided to the magistrate by a reasonably well-trained officer would not provide probable cause would lead to the conclusion that the information before the magistrate was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable," so that Defendant Bone would lose the shield of qualified immunity because he would not even have arguable probable cause. *Malley*, 475 U.S. at 345. Thus, the court finds that, if a reasonable jury were to find that probable cause did not exist for Defendant Bone to obtain the warrants in question, the Plaintiff has cited to cases establishing that a broader, clearly established principle should control the facts of this case and, as such, show that Defendant Bone's actions were clearly established violations of law.

## IV. Conclusion

Because the court finds that genuine issues of material fact exist in the record as to each party's claim for summary judgment, judgment as a matter of law is not proper at this state of litigation. Accordingly, it is hereby **ORDERED** as follows:

1. Plaintiff's Motion for Partial Summary Judgment (doc. 60) is **DENIED**; and

2. Defendant Bone's Motion for Summary Judgment at to Counts I, II, and III (doc. 57) are **DENIED**.

This case shall proceed to trial on all claims and counterclaims.

**DONE** and **ORDERED** on this the 31st day of August, 2026.

**BILL LEWIS**
UNITED STATES DISTRICT JUDGE